UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 APR 23  PM 3: 44

CLERK

BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:19-cr-00122 |
| SEAN GUILLETTE, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS
PHYSICAL EVIDENCE**
(Doc. 48)

Pending before the court is Defendant Sean Guillette's motion to suppress physical evidence obtained as a result of an April 19, 2019 seizure of her phone. (Doc. 48.) Defendant argues that the seizure violated the Fourth Amendment to the United States Constitution because the phone was seized from her vehicle without a warrant while the vehicle was parked at her residence. The government filed an opposition on February 3, 2021. On March 29, 2021, the court held an evidentiary hearing at which Burlington Police Department ("BPD") Corporal Jennifer Cousins testified. At the conclusion of the hearing, the court took the pending motion under advisement.

Defendant is charged with two counts each of the following: knowingly receiving a visual depiction involving the use of a minor engaging in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(2); knowing possession of one matter which contains a visual depiction involving the use of a minor engaging in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(4)(B); and knowingly and intentionally transporting and shipping a visual depiction involving the use of a minor engaging in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(1).

The government is represented by Assistant United States Attorneys Barbara A. Masterson, Nathanael T. Burris, and Nicole P. Cate. Defendant is represented by Assistant Federal Public Defender David L. McColgin.

## I.   Findings of Fact.

On April 11, 2019, Corporal Cousins responded to 25 Elmwood Avenue, Apartment 8 in Burlington, Vermont to investigate a report of domestic assault. 25 Elmwood Avenue is a multi-unit apartment building on the west side of Elmwood Avenue. The building consists of four interconnected structures which almost entirely encircle a paved parking area. Apartment 8 is located in the building on the north side of the property. Unmarked parking spaces are located around the perimeter of the parking area near the buildings. A driveway on the south side of the property provides ingress and egress from Elmwood Avenue. The driveway is sufficiently broad to allow vehicles to continue to access Elmwood Avenue even if the parking spots along the south side of the driveway are occupied.

At the time of her arrival at 25 Elmwood Avenue, Corporal Cousins's body camera footage depicted six vehicles parked in unmarked parking spaces in front of the buildings and in unmarked parking spaces along the south side of the driveway. A dark blue Toyota Highlander (the "Highlander") was not among them. Corporal Cousins spoke with Victoria Morrison who told her that she was Defendant's girlfriend of three years, that she and Defendant had lived together in Apartment 8 for a year, and they were both on the lease. She advised that Defendant had threatened to kill her and had thrown a pair of glasses and a bottle of Windex at her, hitting her with them. She told Corporal Cousins that she wanted Defendant "charged." (Government's Exhibit 3A at 5.) Thereafter, Corporal Cousins and Ms. Morrison decided to move outside of the apartment to speak further because Corporal Cousins was allergic to Ms. Morrison's cats.

As they exited the apartment, Defendant entered the apartment building through an exterior door in front of the door to Apartment 8. Defendant and Corporal Cousins greeted each other. Corporal Cousins advised that she was going to speak to Ms. Morrison outside and asked Defendant: "[D]o you want to go inside and I'll come chat with you in a minute?" to which Defendant responded: "Sure." *Id.* at 8. At the time, Corporal Cousins's body camera footage depicted the Highlander parked on the south side of the driveway. At least five other vehicles were parked closer to Apartment 8 than

the Highlander.

Because of Defendant's arrival on the scene, Corporal Cousins requested assistance from a second unit. Corporal Cousins issued an oath to Ms. Morrison who then averred that Defendant threw her on the bed and tried to smother her by shoving her head into the mattress, causing her trouble breathing and pain which she rated a nine out of ten. She further advised that this was not the first time that Defendant had done this.

At approximately 10:23 a.m., Corporal Erica Schaller arrived on the scene. Corporal Cousins and Corporal Schaller knocked on the outer door of the apartment building and called Defendant's name but received no answer. A neighbor opened the outer door of the building and let BPD officers into the building's common area. The neighbor informed the BPD officers that Defendant had been "screaming a lot lately" including "the other day" and that she almost called the police. *Id.* at 19. She stated that Defendant was "a little high and low" and was "really nice sometimes." *Id.* at 19-20. The neighbor provided her name, date of birth, and phone number and reported that Ms. Morrison was "saying things like, I want my car back, or something which I didn't know was – I always thought that car was [Defendant's]." *Id.* at 21. She commented that Defendant has purchased a vehicle without considering the absence of a parking spot for it. Corporal Cousins asked to which car she was referring and the neighbor replied that it was the blue wagon and that Defendant had asked to park it behind her car because Defendant did not have a parking spot. The neighbor indicated that she had recorded an interaction between Defendant and Ms. Morrison and that she would send the recording to Corporal Cousins.

Apartment 8 was locked and Ms. Morrison did not have her keys with her. Because she had complained that she was cold and asked for her sweatshirt, Corporal Cousins knocked on the door to Apartment 8 and stated that she needed to "grab [Ms. Morrison's] sweatshirt." *Id.* at 23. Again, there was no answer.

While Corporals Cousins and Schaller attempted to make contact with Defendant, Ms. Morrison waited outside the apartment building with BPD Officer Kory Orfant. She told Officer Orfant that she did not drive, did not have an operator's license, and that

3

Defendant also did not have an operator's license. She again stated that she was cold and told Officer Orfant that she was going to sit in the car. Officer Orfant asked Ms. Morrison if the Highlander was her car and she stated that it was. She opened the Highlander's unlocked front passenger door and remarked that Defendant's cell phone was still inside the vehicle. Officer Orfant asked Ms. Morrison whether there was another door or window to her apartment and she walked around the side of the apartment building to show the BPD officers the location of the bathroom window of Apartment 8. Ms. Morrison returned to the Highlander, opened its passenger door, and sat in the front passenger seat of the vehicle for approximately four minutes. Thereafter, she entered the Highlander for a third time and again sat in the front passenger seat where she stayed with the passenger door intermittently open and closed for approximately sixteen minutes. When Ms. Morrison exited the vehicle, she told Corporal Cousins that the jacket she was wearing had been in the Highlander and belonged to Defendant.

After determining that Defendant was no longer inside the apartment building, Corporal Cousins and BPD Sergeant Christopher Nadeau spoke to Ms. Morrison in the common area of the building where she informed them that Defendant had been looking at "kiddie porn" on a cell phone and was a "high-risk sex offender." (Doc. 54-4 at 57:15.) She stated that the officers should "check [Defendant's] phone" and reported that, the previous evening, she had seen Defendant watching a video of an approximately four-year-old boy masturbating with a toy. *Id.* Ms. Morrison told BPD officers that Defendant was "constantly" looking at ten and eleven-year-old females in various stages of undress and viewing pornography in which the females appeared underage. (Government's Exhibit 3A at 47.) She informed Corporal Cousins that Defendant's cell phone was in the Highlander.

Ms. Morrison spoke with BPD's Domestic Violence Investigator after which she stated that she did not wish to provide any further statements and did not wish to file for a restraining order against Defendant. While BPD officers were on the scene, several individuals used the driveway and walked past the Highlander.

When the officers left 25 Elmwood Avenue and returned to BPD, Corporal

4

Cousins consulted with Sergeant Nadeau who suggested that she should secure the cell phone that Ms. Morrison had indicated contained child pornography. Corporal Cousins called Ms. Morrison and asked her "if the phone was still there." Ms. Morrison informed Corporal Cousins that Defendant's cell phone was still in the Highlander and that it was a Samsung phone. Corporal Cousins told Ms. Morrison that she would come back to retrieve the phone. Corporal Cousins testified that it is not her practice to ask non-law enforcement individuals to obtain and secure evidence on her behalf. The court finds Corporal Cousins's testimony credible.

When Corporals Cousins and Schaller returned to 25 Elmwood Avenue, they met with Ms. Morrison who handed them a Samsung cell phone and stated it was the cell phone Defendant used to view alleged child pornography. Corporal Cousins took the Samsung cell phone and removed its battery to prevent it from being wiped remotely. BPD did not investigate the registration of the Highlander to determine its ownership prior to the seizure of the Samsung cell phone.

On April 23, 2019, BPD Detective Thomas Chenette, who was investigating Defendant's alleged possession of child pornography, learned that on March 16, 2019, Instagram had made a report to the National Center for Missing and Exploited Children concerning a suspected upload of a file of child pornography from a user screenname of seanguillette5710 with the associated email address "seanguillette2@gmail.com." Detective Chenette reviewed the file and discovered "an image file of a prepubescent female, about 11 years old, nude on her back on a bed with her legs above her and her vagina and anus visible. The focal point of the image is the child's genitals." (Doc. 54-2 at 14.) Instagram provided the name "Seanguillette" as associated with the account, as well as the phone number 8024959442 which Detective Chenette avers matches the number of the Samsung phone seized on April 11, 2019.

That same day, BPD received a report from Pathways Vermont that on April 18, 2019, Defendant had logged into her iCloud account using a computer at Pathways' community center and was attempting to delete child pornography from her cell phone. Pathways gave the computer to BPD and provided written consent for it to be searched.

5

On April 24, 2019, Detective Chenette obtained a search warrant for the Samsung cell phone that was seized from the Highlander. On April 26, 2019, Defendant returned to Pathways where she was arrested for the domestic assault of Ms. Morrison. On April 27, 2019, Detective Chenette executed the state search warrant on the Samsung cell phone. Based on the evidence obtained by virtue of the state search warrant, Homeland Security Special Agent Michael McCullagh obtained a federal search warrant for the Samsung cell phone which revealed alleged child pornography.

On May 2, 2019, a BPD officer informed Detective Chenette that the Pathways computer contained multiple images of alleged child pornography and photos of Defendant with an access date of April 18, 2019. On May 17, 2019, Detective Chenette obtained search warrants for the "seanguillette2@gmail.com" email account, a "seanguillette16@gmail.com" email account, the "seanguillette5710" Instagram account, and an Alcatel phone seized from Defendant at the time of her arrest.

## II.    Conclusions of Law and Analysis.

### A.    Whether Ms. Morrison Acted as a Government Agent in Seizing Defendant's Samsung Phone.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" absent "probable cause, supported by oath or affirmation[.]" U.S. CONST. amend. IV. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (footnotes omitted).

The Fourth Amendment governs "only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official." *Id.* (internal quotation marks and citation omitted). However, "if, in conducting the search, the searcher is acting as an instrument or agent of the Government, there is a Fourth Amendment transgression." *United States*

*v. Bennett*, 709 F.2d 803, 805 (2d Cir. 1983) (observing that "some degree of governmental knowledge and acquiescence" must be established to find a private person's search violates the Fourth Amendment).

> A search conducted by private individuals at the instigation of a government officer or authority [is] attributable to the government for purposes of the Fourth Amendment . . . only where there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself[.]

*United States v. DiTomasso*, 932 F.3d 58, 67-68 (2d Cir. 2019) (internal quotation marks and citations omitted). "The purpose of the close-nexus requirement is to assure that constitutional standards are invoked only when it can be said that the government is *responsible* for the specific conduct of which the accused complains." *Id.* at 68 (internal quotation marks, alterations, and citation omitted). "The requisite nexus is not shown merely by government approval of or acquiescence in the activity." *Id.* On the other hand, "'if [the officer] had a hand in [the search] . . . [s]o long as [she] was in it before the object of the search was completely accomplished, [she] must be deemed to have participated in it.'" *United States v. Knoll*, 16 F.3d 1313, 1320 (2d Cir. 1994) (quoting *Lustig v. United States*, 338 U.S. 74, 78-79 (1949)). "[I]t is immaterial whether the government originated the idea for a search or joined it while it was in progress" because "[t]he government may become a party to a search through nothing more than tacit approval." *Id.*

"Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of the circumstances." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989). "The party objecting to the search has the burden to establish by a preponderance of the evidence that the government involvement was significant enough to change the character of the search." *United States v. Couch*, 378 F. Supp. 2d 50, 55 (N.D.N.Y. 2005) (citing *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987)); *United States v. Snowadzki*, 723 F.2d 1427, 1429 (9th Cir. 1984) (holding that "[t]he

burden of establishing government involvement in a private search rests on the party objecting to the evidence").

In deciding whether a private person is acting as a government agent, courts "consider[]: (i) whether the government knew of and acquiesced in the citizen's conduct, (ii) whether the citizen intended to assist law enforcement, and (iii) whether the citizen acted at the government's request." *United States v. Stephen*, 984 F.3d 625, 629 (8th Cir. 2021); *see also United States v. Dupree*, 781 F. Supp. 2d 115, 158 (E.D.N.Y. 2011) (holding that "[t]o determine whether a private party acted as a government agent, the court must consider whether the government knew or at least acquiesced in the search and seizure and whether the private searcher intended to assist law enforcement as opposed to simply achieving [her] own ends") (internal quotation marks and citations omitted).

In this case, Defendant asserts that Ms. Morrison was acting as an agent of the government when she retrieved the Samsung cell phone from the Highlander and gave it to Corporal Cousins because, by asking Ms. Morrison to verify its presence in the Highlander and stating that she would return to retrieve it, Corporal Cousins tacitly "encourage[ed] [Ms. Morrison] to seize [Ms.] Guillette's Samsung phone from [her] car." (Doc. 48 at 3.) The government counters that the court "need not decide the issue of whether Morrison was acting as an agent of law enforcement because . . . no warrant was required to search the Highlander." (Doc. 54 at 10.)

Ms. Morrison clearly intended to assist law enforcement when she seized the Samsung cell phone from the Highlander but Corporal Cousins did not request this assistance or suggest it would be helpful. At most, she merely confirmed the Samsung cell phone's location while stating that she would return to retrieve it. As Ms. Morrison had previously ceased her engagement with law enforcement after talking to a Domestic Violence Investigator, Corporal Cousins had no reason to believe that she would take it upon herself to seize the Samsung cell phone and turn it over to law enforcement. To find otherwise would task law enforcement with predicting whether, when, and how a private person asked about the location of a piece of evidence might decide to search for it and

8

seize it. Accordingly, Ms. Morrison was not acting as a government agent when she searched the Highlander for Defendant's cell phone, seized it, and provided it to Corporal Cousins. The court further agrees with the government that this issue is not dispositive if the seizure of Defendant's Samsung cell phone was otherwise lawful.

**B.     Whether the Highlander was Parked in the Curtilage of Defendant's Home.**

The government contends that the seizure of Defendant's Samsung cell phone was permissible because "[a]lthough the Fourth Amendment generally requires police to obtain a warrant before conducting a search, there is a well-established exception for vehicle searches." *United States v. Jones*, 893 F.3d 66, 70 (2d Cir. 2018). "Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004).

Defendant does not dispute that the Highlander was readily mobile or that there was probable cause to search it, but argues that the Highlander was parked "in a location associated with h[er] apartment and thus within the curtilage of h[er] residence." (Doc. 48 at 4.) The "curtilage" is "'the area immediately surrounding and associated with the home'" and is considered "'part of the home itself for Fourth Amendment purposes.'" *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). The automobile exception does not permit "a police officer, uninvited and without a warrant, to enter the curtilage of a home in order to search a vehicle parked therein." *Id.* at 1668.

In *United States v. Jones*, the Second Circuit held that "the *shared* driveway of tenants in two multi-family buildings" was "not within the curtilage of [defendant's] home" because it was "a common area accessible to other tenants . . . and therefore [defendant] could not reasonably expect that it should be treated as part of his private home." 893 F.3d at 72. Here, as in *Jones*, the Highlander was parked in a shared driveway of a multi-family building that was accessible by other tenants and their guests.

Defendant did not have an assigned parking space in the driveway and did not have the power to exclude others from the area in which the Highlander was parked. BPD officers' body cameras recorded multiple individuals accessing the south side of the driveway and walking by the Highlander during their investigation. This distinguishes the facts from *Collins*, where the vehicle was parked "in the portion of the driveway beyond where a neighbor would venture[.]" 138 S. Ct. at 1673 n.3.

Because the Highlander was parked in an unassigned spot in a shared parking lot for a multi-unit building that was accessible to other tenants and their guests, the Highlander was not within the curtilage of Defendant's residence. The government has further established probable cause to seize the Samsung cell phone for evidence of alleged child pornography. The search of the Highlander was therefore permissible under the automobile exception to the warrant requirement, and Defendant's motion to suppress is DENIED.

### C. Whether Ms. Morrison had Apparent Authority to Consent to a Search of the Highlander.

Alternatively, the government contends that Ms. Morrison had apparent authority to consent to the search of the Highlander based on her apparent joint ownership and joint use of the Highlander. "A search conducted pursuant to consent by an authorized third party does not require probable cause or a warrant." *Koch v. Town of Brattleboro, Vt.*, 287 F.3d 162, 167 (2d Cir. 2002). "The question with respect to a third-party authorization is whether the third party possesse[s] 'a sufficient relationship to the searched premises to validate the search.'" *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) (quoting *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988)).

"[T]hird-party consent to a search will validate the search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992). "[E]ven if the third party did not have the requisite relationship to the premises, and therefore lacked the authority to give a valid consent, official reliance on [her] consent

may validate the search if it was reasonable for the officers to believe [s]he had the requisite relationship." *Elliot*, 50 F.3d at 186 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990)).

At the time of the search, the Highlander was unlocked and Ms. Morrison sat in it for an extended period of time, entering and exiting it on multiple occasions. She therefore had access to it. She told BPD officers that she and Defendant had been in a romantic relationship for three years and had been living together in a shared apartment for a year. *See Koch*, 287 F.3d at 167 (holding that third-party consent to search defendant's apartment was valid where an officer had seen the defendant and his companion "together often and believed them to be very close" even though she maintained a separate residence). Ms. Morrison further informed BPD officers that she did not drive or have an operator's license, however, she nonetheless identified the Highlander as "her" vehicle. A neighbor likewise told BPD that while she previously believed the Highlander belonged to Defendant, she overheard Ms. Morrison telling Defendant that she "want[ed] [her] car back[,]" which she identified as the "blue wagon" parked behind her own vehicle. (Government's Exhibit 3A at 21.)

Although BPD officers did not investigate the ownership of the Highlander by checking its registration before it was searched, it was reasonable for them to believe that Ms. Morrison had common authority over it, a substantial interest in it, and permission to grant access to it. As a result, "'the facts available to [Corporal Cousins] at the moment . . . warrant[ed] a [person] of reasonable caution in the belief that the consenting party had authority over the [vehicle.]'" *Koch*, 287 F.3d at 167 (quoting *Rodriguez*, 497 U.S. at 188) (internal quotation marks omitted).

Because Ms. Morrison had apparent authority to consent to a search of the Highlander, even assuming *arguendo* that she acted as the government's agent in retrieving the Samsung cell phone from it, her search of the Highlander and seizure of Defendant's Samsung cell phone were lawful. Defendant's motion to suppress for lack of consent is therefore DENIED.

11

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion to suppress. (Doc. 48.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 23rd day of April, 2021.

Christina Reiss, District Judge
United States District Court